

FILED
JAMES BONINI
CLERK

09 NOV 13 PM 2: 13

U.S. DISTRICT COURT
SOUTHERN DIST. OHIO
EAST. DIV. COLUMBUS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| Alps South LLC, | ) | Case No.  **2 : 09 cv 1 0 2 7** |
| Plaintiff, | ) | Judge |
| -vs- | ) | **COMPLAINT AND JURY DEMAND** |
| The Ohio Willow Wood Company | ) | |
| And | ) | **JUDGE GRAHAM** |
| Bruce Kania, | ) | |
| Defendants. | ) | **MAGISTRATE JUDGE ABEL** |

Plaintiff, Alps South LLC ("Alps"), for its complaint against defendants, The Ohio Willow Wood Company ("OWW") and Bruce Kania ("Kania"), says that:

### JURISDICTION AND VENUE

1.      This is an action arising under the laws of the United States, 15 U.S.C. § 1, *et seq*. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 and because defendants' activities are in and affect interstate commerce. This Court has subject matter jurisdiction also under 15 U.S.C. § 15(a) and § 1125(a).

2.     This Court has personal jurisdiction over OWW and Kania because OWW is an Ohio corporation with its principal place of business in the State of Ohio, and because Kania has engaged in conduct, activities and transactions in this District and in the State of Ohio that have given rise to the claims asserted herein.

3.     Venue is proper in this judicial district under 28 U.S.C. §§ 1391(b) and under 15 U.S.C. § 15.

## PARTIES

4.     Alps is a Florida LLC, and it has its principal place of business in St. Petersburg, Florida.  Alps manufactures fabric-covered polymeric gel liners and markets and sells them to distributors and prosthetists throughout the United States.  Its products are then resold to amputees who reside throughout the United States.

5.     OWW is an Ohio corporation, and it has its principal place of business within this District in Mt. Sterling, Ohio.  OWW manufactures fabric-covered polymeric gel liners and markets and sells them to distributors and prosthetists throughout the United States. Its products are resold to amputees who reside throughout the United States.

6.     Bruce Kania is an individual residing in Bozeman, Montana, who has engaged in conduct, activities, and transactions relevant to the claims in this lawsuit.

## COUNT I

## (ANTITRUST CLAIMS)

7.     Alps realleges and incorporates by reference the allegations of paragraphs 1-6 of this complaint.

**The Relevant Markets**

8.    Since OWW and Alps market and sell their products to distributors and prosthestists in interstate commerce throughout the United States, the relevant geographic market for the purposes of Alps' claims under §§ 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, is the United States.

9.    A relevant product market for the purposes of Alps' claims pursuant to §§ 1 and 2 of the Sherman Act is the market for fabric-covered polymeric gel liners that are used by amputees to act as a cushion between a residual limb and a prosthetic device and in some cases to assist in attaching a prosthetic device to a residual limb.  A number of sellers, including OWW, Alps, DAW Industries, Inc. ("DAW"), Thermo-Ply, Inc. ("Thermo-Ply"), Silipos, Inc. ("Silipos"), Fillauer Companies, Inc. ("Fillauer"), Otto Bock HealthCare GmbH ("Otto Bock") and Ossur hf ("Ossur"), among others, compete within this market.  Fabric-covered polymeric gel liners have significant advantages over other means of providing cushioning between a prosthetic device and a residual limb, so prosthestists, who fit amputees with prosthetic limbs, are unlikely to substitute these other means for a fabric-covered polymeric gel liner, even if the price of a fabric-covered polymeric gel liner is increased or reimbursement from insurers or Medicare is limited.

**General Description Of Antitrust Claims**

10.    Alps' claims under § 1 and § 2 of the Sherman Act arise from OWW's scheme to unreasonably restrain trade and harm competition in the United States and to monopolize or attempt to monopolize the market for fabric-covered polymeric gel liners (the "market") that are worn by amputees using prosthetic devices for above knee and below knee amputations in the United States.  OWW has procured through fraud on the United States Patent

3

and Trademark Office ("USPTO") patent protection for a fabric-covered polymeric gel liner used by amputees to provide a soft interface between a residual limb and a prosthetic limb, and as a result, several patents, including U.S. Patent No. 6,964,688 ("'688 patent"), U.S. Patent No. 5,830,237 ("'237 patent") and U.S. Patent No. 7,291,182 ("'182 patent"), whose subject matter covers fabric-covered polymeric gel liners for use by below knee and above knee amputees, have been issued to Kania and assigned to OWW.

11.    OWW markets and sells commercial embodiments of fabric-covered polymeric gel liners, known as its "Alpha" line of products, throughout the United States and, therefore, OWW's activities are in and affect interstate commerce.

12.    To accomplish its objectives of illegally restraining trade and obtaining and maintaining a monopoly in the market for fabric-covered polymeric gel liners, OWW in concert with Bruce Kania, has used the patents it obtained by committing fraud on the USPTO to foreclose and restrain competition in the market for fabric-covered polymeric liners and to directly cause injury to competitors, including Alps, and to competition in the markets.  It has done so by filing infringement lawsuits against Alps and other competitors in an effort to exclude them from the market and causing them to expend great sums in defending themselves against the infringement actions, which greatly impairs their ability to compete in this market, thereby creating an intentional reduction or elimination of competition in the markets.  Also, as a result of OWW initiating litigation based on the '688 patent and its other fraudulently obtained patents, or threatening such litigation, OWW has entered into agreements licensing the fraudulently obtained patents to certain competitors of OWW in the above-described market, who have agreed to limit their sales of competing liners in United States, or have agreed to pay a substantially increased royalty if their sales volume for such products exceeds a certain ceiling,

4

thereby as a practical matter preventing them from selling competing liners above the agreed upon ceiling in United States with the deliberately intended result of reducing or eliminating competition in the relevant market. As a result of OWW's conduct, trade in the market for fabric-covered polymeric gel liners has been unlawfully restrained in the United States and in interstate commerce, and it will or has allowed OWW to obtain and maintain monopoly power in the market for fabric-covered polymeric gel liners.

**Specific Allegations**
**OWW's Fraudulent Procurement Of The '688, '237 And '182 Patents Or Reexamination Certificates**

13.     OWW is the assignee of several nearly identical patents, which essentially cover the same subject matter--a fabric-covered polymeric gel liner that provides a cushion between the amputee's residual limb and the prosthesis ("OWW Fraudulently Obtained Patents").

14.     Bruce Kania is named as the sole inventor on each of the OWW Fraudulently Obtained Patents. Kania, who resides in Montana, began work on developing a fabric-covered gel liner in the early 1990s. During this time, he was assisted by co-developers of this product, including Dr. Carol Salusso and others. Around 1994, he approached OWW about helping him further develop and market certain products that he had been developing, including the fabric-covered gel liner. OWW agreed to help him develop and process patents on the fabric-covered gel liner, and in return for a substantial royalty to be paid from the sales of such liners and OWW's agreement to advance the cost of procuring patents for this putative invention, Kania granted OWW an exclusive license to any patents that would be issued to him, and he has in fact assigned such patents to OWW.

15.     Kania is not employed by OWW and has not been employed by OWW at any time pertinent to this action. He is not affiliated with OWW and is not an officer, director, or

agent of OWW.  Consequently, Kania and OWW are separate actors capable of agreeing, acting in concert, or colluding to unlawfully restrain trade in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.  Kania and OWW have acted in concert to obtain the OWW Fraudulently Obtained Patents and to unlawfully attempt to enforce these patents against OWW's competitors, including Alps.

16.     On March 5, 1996, OWW filed patent application No. 08/611,306, which issued on November 3, 1998, as the '237 patent", entitled "Gel and Cushioning Devices."

17.     The '237 patent is one of the OWW Fraudulently Obtained Patents and, as originally issued, contained broad claims that purport to generally claim as an invention, tube sock-shaped liners composed of a fabric covering with a gel composition on the inside that will be next to the skin of the wearer when the liner is donned.

18.     On July 23, 1998, OWW filed a continuation of the No. 08/611,306 application, application No. 09/121,300, which issued on November 6, 2007 as the '182 patent, also entitled "Gel and Cushioning Devices."

19.     The '182 patent, also one of the OWW Fraudulently Obtained Patents, contains broad claims that purport to generally claim as an invention, a form fitting, fabric-covered gel liner.

20.     On October 15, 1999, OWW filed patent application No. 09/418,505, which issued on November 15, 2005, as the '688 patent entitled "Tube Sock-Shaped Covering." This application was a continuation of application No. 08/688,954, filed on July 31, 1996 and later abandoned.

21.     The '688 patent, one of the OWW Fraudulently Obtained Patents, originally contained broad claims that purported to generally claim a tube-shaped, fabric

6

covering coated on only the inside of the fabric covering with a polymeric gel for use with prosthetic limbs.

22. Since at least 2004, attorneys at the Standley Law Group, LLC have prosecuted the applications or reexaminations of the OWW Fraudulently Obtained Patents and have represented OWW in the infringement lawsuits that OWW filed against its competitors regarding these patents.

23. Before the application that resulted in the '688 patent was filed on October 15, 1999, OWW and its counsel were aware of prior art that covered the same subject matter as claimed in claims of the '688 patent that had been on sale in the United States more than a year before the critical date for the '688 patent, July 31, 1995. In the Declarations filed in connection with the original application, Bruce Kania, OWW's CEO, Robert Arbogast, and its Director of Engineering, James Colvin, among others, were listed as inventors, and Kania, Arbogast, and Colvin represented that they knew of no other inventors other than those listed on the declaration for the invention being claimed, when they knew that was not true. They also failed to disclose this prior art to the USPTO or they intentionally mischaracterized the nature of this prior art in the prosecution of the application that resulted in the '688 and '182 patents and in connection with the reexaminations of the '688, '237, and '182 patents. They did so for the purpose of misleading the USPTO as to the prior art in existence before the critical date, so that the USPTO would issue the '182 and '688 patents and the reexamination certificates for the '688, '237 and '182 patents. In addition, to overcome an office action rejecting claims set forth in the '688 patent application, OWW misled the USPTO by amending the application to eliminate all of the co-inventors who originally were listed as inventors, except for Kania, even though the

inventions of some of these inventors remained in the claims of the application and even in the claims as issued.

### The Salusso Material Information OWW Withheld From The USPTO

24.     Prior to 1996, Kania disclosed to OWW, both in a written product description given to OWW and orally that Dr. Carol Salusso worked with him as a "co-developer" of the fabric covered thermoplastic gel liner later claimed in the '688, '237, and '182 patents.

25.     Dr. Salusso was never contacted by OWW or its patent counsel in connection with the applications for the above-mentioned patents, nor was she listed as a co-inventor on any of those patents.  Dr. Salusso only became aware that OWW obtained patents on the products she co-developed as a result of being contacted by attorneys representing OWW's competitors who are being sued for infringement of one or more of the OWW Fraudulently Obtained Patents.

### The Silipos Material Prior Art OWW Withheld From The USPTO Or Mischaracterized

26.     In April of 1999, an attorney for one of OWW's competitors, Silipos, apparently responding to an assertion by OWW that a Silipos product infringed the '237 patent, wrote to OWW's CEO, Arbogast, and expressly informed him that Silipos had been selling their Silosheath product line since 1992 and that it included more than one type of sock:  "one containing a polymeric gel on only the inside of the sock and another type containing a polymeric gelatinous material on both sides."  He further stated that Silipos' original sales of their "Silosheath tube-shaped sock product line having the gelatinous material on only the inside of the sock pre-date the filing date of the Kania application."

27.     The Silipos letter to Arbogast also enclosed a copy of Silipos' November 29, 1994 amendments to a later abandoned patent application that Silipos originally filed on June 5, 1993. Claim 1 of the Silipos amendment described a:

> protective garment comprising: a fabric outer layer; and an inner layer comprising a gel, said gel comprising a poly (styrene-ethylene-butylene-styrene) tri-block copolymer and mineral oil, wherein said inner layer is directly accessible to the skin of a wearer of the protective garment.

The gel disclosed in the Silipos amendment is a polymeric gel. The 1994 Silipos amendment set forth above and the other Silipos amendments predate the critical dates for the '688, '237 and '182 patents, and disclose expressly or implicitly the inventions claimed in those patents.

28.     Thus, OWW possessed actual knowledge at least as early as April of 1999, approximately six months before it filed its application for the '688 patent, that Silipos had manufactured and sold products covered by the claims of the '688, '237 and '182 patents, as well as filing amendments to an application disclosing the claimed invention, before the critical date for each of the above-mentioned patents.

29.     On October 28, 1999, the same Silipos attorney sent a letter to OWW's patent counsel at the time, Richard L. Treanor, enclosing an invoice that lists various Silosheath products, dated November 1, 1993. One of the products listed on the invoice was the Silosheath product having the gelatinous material on only the inside of the sock. An example of this product was sent to Mr. Treanor with the letter.

30.     Thus, at the time the original application for the '688 patent was filed, during the prosecution of this application, during the prosecution of the '182 application, and the reexaminations of the '688, '237 and '182 patents, OWW had actual knowledge that Kania was not the inventor of the invention claimed in the '688, '237, and '182 applications and patents.

Furthermore, OWW failed to disclose the Silipos letters from April and November of 1999, the 1994 amendments to the Silipos application, or the example of the Silosheath with the polymeric gel on only the inside of the sock that had been sent to OWW's patent counsel, to the USPTO at any time during the prosecution of the application that resulted in the '688 and '182 patents or in any of the subsequent reexamination proceedings of the '688, '237 and '182 patents, although this information would be highly material to a patent examiner in determining whether a patent should be issued and whether claims should be allowed in a subsequent reexamination.

31.     There was another Silipos product that was part of its Silosheath product line that was on sale before the critical dates for the '688, '237 and '182 patents known as the single socket gel liner ("SSGL").  The SSGL is a tube-shaped fabric covered liner made of a Coolmax material that is open at one end and closed at the other and that has a polymeric gel material on only the inside surface, so that when the SSGL is worn, the polymeric gel is next to the skin and is capable of creating an airtight seal between the skin and the liner.  The SSGL was advertised in trade publications as early as October of 1994 and was on sale by then.  That the SSGL, as described above, was on sale prior to March 5, 1995 was confirmed by Silipos in 2006 in a Rule 30(b)(6) deposition taken by Alps in connection with the case OWW filed against Alps, alleging infringement of the '237 patent, and by the deposition testimony in the same case of a Silipos executive from the period prior to July 31, 1995, Jean-Paul Comtesse.

32.     Approximately 10 years ago, many years before the '688 and '182 patents issued, OWW obtained a Silipos SSGL.   Although it may have submitted a document referencing the SSGL as prior art in connection with its application for the '688 patent, it never provided any additional information concerning the SSGL to the USPTO during the prosecution of the original applications for the '688 and '182 patents, even though it had had an example of an

SSGL in its possession and knew that it met all of the limitations of the invention claimed in the applications.

33.    In 2006, before the reexamination certificate concerning the '688 and '237 patents issued, a former executive of Silipos, Jean-Paul Comtesse, testified (in the presence of OWW's counsel from the Standley Law Group) at his deposition in connection with the Ohio patent litigation filed against Alps alleging infringement of the '237 patent. Mr. Comtesse testified: (1) in October, 1994, Silipos marketed its SSGL to its customers and that it was on sale prior to March of 1995; (2) the SSGL was made of a layer of tri-block co-polymer gel, covered on the outside with Coolmax fabric and was open at one end and enclosed at the other; (3) the inside of the fabric cover of the SSGL was dipped in a co-polymer gel and the fabric was thus directly coated on only the inside with the gel; (4) if there was gel on the outside of the fabric cover, the liner was rejected by quality control; (5) the gel layer of the SSGL was worn against the amputee's skin and was capable of creating an airtight seal between the skin and the liner; (6) the gel on the Silipos SSGL was thicker at the distal end than at the open end and such gel ranged between 4 or 5 millimeters at the distal end and up to 2 to 2.5 millimeters at the opposite end; and (7) the polymeric gel in the SSGL sold before March of 1995 included mineral oil. Mr. Comtesse's testimony was further confirmed in the presence of OWW's attorneys from the Standley Law Group by Silipos in the above-described Rule 30(b)(6) deposition taken in 2006 and the exhibits to the deposition.

34.    After the '688 patent issued in November of 2005, the USPTO granted three reexamination requests concerning different claims of this patent. After claim 1 and the claims that depend on claim 1 were rejected during the reexamination proceedings, OWW requested an interview with the reexamination examiners. During this interview, which took

place in July of 2007 after the Comtesse deposition and the Silipos Rule 30(b)(6) deposition, and

which was attended by Kania, Colvin, and two attorneys from the Standley Law Group LLC,

OWW asserted that its claimed invention was different from the Silipos prior art and therefore

should be allowed, because its invention claimed a liner in which polymeric material was coated

on only the inside of the liner.  To distinguish the Silipos Silosheath prior art, OWW brought

with it to the interview a Silosheath that is alleged to be from the pre-critical date period.  This

particular Silosheath had gel on both the inside and outside of the fabric, and it was on this basis

that the USPTO later distinguished the prior art from the invention claimed in the '688 patent,

although it did require amendments to the language of the claims, so that it was clear that the gel

had to reside on only the inside surface of the liner.  OWW and Kania did not bring a Silosheath

with gel on only the inside of the liner or an SSGL to the interview with the reexamination

examiners or disclose their knowledge concerning them to the reexamination examiners, even

though they were aware from numerous sources that Silipos had such products on sale before the

critical date for the '688 patent.

        35.    Despite OWW's knowledge that there were other Silipos Silosheath

products manufactured and sold prior to the critical date in which the gel was on only the inside

of the liner, despite its knowledge that the SSGL also has gel on only the inside of the liner, and

despite its knowledge of Comtesse's deposition testimony and the Silipos Rule 30(b)(6)

deposition, OWW failed to disclose this information to the USPTO during the interview or

thereafter during the reexaminations proceedings for the '688, '237 and '182 patents.

        36.    In responding to the USPTO after the interview concerning the

reexaminations of the '688 patent, an attorney from the Standley Law Group intentionally

mischaracterized how the SSGL shown in a pre-critical date advertisement had been constructed.

Although OWW had obtained an example of an SSGL, which clearly showed the polymeric coating on only the inside of the liner, and despite language from the advertisement itself that states that the SSGL is worn next to the amputee's skin, OWW's counsel represented to the USPTO that the SSGL is not relevant to the claimed invention, because it was constructed so that the polymeric gel was between an inner and outer covering of fabric. OWW made similar representations in connection with the reexamination of the '182 patent.

**The Fay Material Information And Prior Art Of OWW Failed To Disclose To The USPTO**

37.    In July of 2006, OWW's counsel took the deposition of John N. Fay, president of another of its competitors, Thermo-Ply, in connection with another lawsuit against Alps pending in the United States District Court for the Southern District of Ohio, alleging that Alps is infringing OWW's '237 and '499 patents. During his deposition, Mr. Fay testified that his prior company, Florida Orthopedic Center, made and sold fabric-covered polymeric gel liners as early as 1992.

38.    During the same deposition, Mr. Fay produced and described two different fabric-covered gel liners that Florida Orthopedic made and sold at least as early as 1994, together with patient notes relating to those liners, receipts for materials used to make them, and even the obituary of the patient for whom the Fay liners were made. These liners were on sale before the critical dates for the '688, '237 and '182 patents.

39.    Mr. Fay also testified that he had storage units filled with additional documentary support to corroborate his testimony that Florida Orthopedic Center made and sold other fabric-covered gel liners in the 1992 through 1994 time frame.

40.    After Mr. Fay's deposition, Arbogast and Colvin both traveled to Tampa and personally inspected the Fay liners.

41.     Despite OWW's knowledge that the Fay liner anticipated or made obvious the inventions claimed in the '688, '237 and '182 patents, it failed to disclose its knowledge about the Fay liner to the USPTO during the interview in July of 2007 in connection with the reexamination proceeding of the '688 patent or at any time thereafter during the reexaminations of the '688 and '237 patents and the prosecution and reexamination of the '182 patent.

**The Michael Material Information OWW Withheld From The USPTO**

42.     On April 19, 2007, OWW's own expert witness in the field of prosthetics, John Michael, testified that a fabric coated gel liner was "obvious" in the 1980s, and that a patent claiming such an invention would be invalid for obviousness.

43.     Michael also testified at a *Markman* hearing held on July 18, 2007 in litigation relating to the '237 patent between OWW and another competitor named Thermo-Ply pending in Tampa that liners with a distal means for attaching a prosthesis appeared in the United States before 1990.

44.     Despite having actual knowledge of Michael's testimony, OWW and its counsel continued to represent to the USPTO during the reexamination proceedings that the subject matter of the '688 and '237 was patentable.   It also continued to represent during the prosecution of the original application and subsequent reexamination of the '182 patent that the subject matter of that patent was patentable.

45.     Although OWW and Kania were obligated to do so, they failed to disclose the Silipos Material Information and Prior Art, the Salusso Material Information, the Fay Material Information and Prior Art, and/or the Michael Material Information in connection with the applications and/or reexaminations of the '688, '237 and '182 patents, and which demonstrated that the inventions claimed therein were on sale before the respective critical dates

and/or was obvious to a person of ordinary skill in the art.  Furthermore, OWW and Kania intentionally and falsely represented that Kania was the inventor of the inventions claimed in the '688 and '182 patents when they knew that they had been invented by other persons before Kania, when Kania and OWW knew that Salusso was a co-developer with Kania of his putative inventions and when OWW amended the '688 application to eliminate co-inventors, whose inventions remained in the application or the patent as issued.  OWW also mischaracterized the SSGL, as discussed in paragraph 36, above.

46.    Acting in reliance on and as a result of the failure of OWW and Kania to disclose such material information and prior art and of their intentionally false representations to the USPTO, the USPTO issued the '688 and '182 patents and then later issued reexamination certificates allowing the claims of the '688 and '237 patents as amended during the reexamination.

47.    Had OWW and Kania disclosed such material information and prior art and not made such fraudulent misrepresentations to the USPTO, the USPTO would not have issued the '688 and '182 patents and the reexamination certificates for the '688 and '237 patents.

48.    After the reexamination certificate for the '688 patent issued in early 2009, Alps' CEO, Dr. Aldo Laghi, filed an *ex parte* reexamination request regarding all 71 claims of the '688 patent as they had been amended during the earlier reexamination proceedings, in which some of the foregoing material information was disclosed to the USPTO.  In response, on June 19, 2009, the USPTO issued an office action rejecting all 71 claims.

49.    Dr. Laghi had also filed *ex parte* reexamination proceedings regarding all of the claims of the '237 and '182 patents in which he disclosed some of the foregoing material information to the USPTO.  On April 27, 2009, the USPTO rejected all 23 claims of the '237

patent and on June 19, 2009, it rejected all 62 claims of the '182 patent. After OWW responded to the office action rejecting all of the claims of the '182 patent, the USPTO issued a **final** office action rejecting all of the relevant claims of the '182 patent on November 3, 2009.

50.     OWW, Kania and/or its counsel knew that this undisclosed material information anticipated, made obvious, or otherwise undermined or destroyed the patentability of the claims of the OWW Fraudulently Obtained Patents, as originally issued and in the cases of the '688 and '237 patents, as amended in the reexamination proceedings, and that a reasonable patent examiner would have regarded such undisclosed material information as important to the patentability of the inventions claimed in the OWW Fraudulently Obtained Patents.

### OWW And Kania Have Used Federal Litigation To Enforce The OWW Fraudulently Obtained Patents As A Means To Exclude Competition While Knowing That Such Litigation Is Objectively Baseless

51.     OWW and Kania have used the OWW Fraudulently Obtained Patents in an effort to exclude competition from the fabric-covered polymeric gel liner market.

52.     The '688 patent was issued on November 15, 2005, and on the next day OWW initiated an action against Alps for infringement of the '688 patents. OWW had also initiated infringement litigation against Alps in the United States District Court for the Southern District of Ohio in 2004 alleging that it infringed OWW's '237 and '499 patents. OWW also had asserted a counterclaim for infringement against Alps asserting infringement of OWW's '182 patent in a declaratory judgment action for a declaration of non-infringement and invalidity filed by Alps, that is pending in the United States District Court for the Middle District of Florida.

53.     OWW has also filed infringement actions against other competitors in the market for fabric-covered polymer gel liners. In 2004, OWW brought an action against DAW for infringement of OWW's '237 patent in the United States District Court for the Southern

16

District of Ohio, based on DAW's sales of its Cool Liner product line, which are a fabric-covered gel prosthetic liners manufactured by Thermo-Ply.   In 2005, OWW filed another patent infringement action against DAW in the same court for infringement of OWW's '688 patent.   In November of 2007, OWW filed an infringement action against Thermo-Ply in the United States District Court for the Eastern District of Texas, alleging infringement of the '182 patent.   OWW also filed an action against Fillauer in the United States District Court for the Southern District of Ohio, alleging that Fillauer infringed its '237, '499 and '688 patents.   This case was settled and dismissed in December of 2006.

54.     OWW has initiated and maintained lawsuits against Alps regarding the OWW Fraudulently Obtained Patents with knowledge that the undisclosed material information would ultimately render the claims of these patents invalid and unenforceable.   Such litigation was initiated and is being maintained in bad faith and is objectively baseless and, therefore, a sham.

55.     Because OWW and Kania committed fraud on the USPTO in obtaining the OWW Fraudulently Obtained Patents, and/or because at the time OWW initiated the litigation described in paragraph 52, above, it was objectively baseless, since OWW had knowledge of facts that would render the OWW Fraudulently Obtained Patents invalid and unenforceable, OWW is not immune from liability for violating the antitrust laws of the United States.

### OWW Has Violated § 1 Of The Sherman Act

56.     As described in paragraphs 1-55, above, OWW and Kania, acting in concert, have unreasonably restrained trade in the market for fabric-covered polymeric gel liners in the United States by filing lawsuits to enforce the OWW Fraudulently Obtained Patents

against Alps and other competitors in a naked effort to force Alps and these other competitors from this market in violation of § 1 of the Sherman Act, 15 U.S.C. § 1.

57.   OWW has also unreasonably restrained trade in the market for fabric-covered polymeric gel liners in violation of § 1 of the Sherman Act by coercing Fillauer and Otto Bock, through litigation alleging infringement of the OWW Fraudulently Obtained Patents or through threats of such litigation, into agreements that licenses the OWW Fraudulently Obtained Patents to them, but that impose such unreasonable royalties for the sale of such products beyond certain minimal ceilings in the United States that as a practical matter Fillauer and Otto Bock are placed at a significant disadvantage in selling such products, thereby impairing their ability to compete effectively, which has in turn harmed competition within the market for fabric-covered polymeric gel liners.  The licensing agreements between OWW and Otto Bock and Fillauer are effectively agreements to limit their sales of competing fabric-covered polymeric gel liners in the United States.

58.   OWW's conduct in violation of § 1 of the Sherman Act is *per se* unlawful and unlawful under the rule of reason.

59.   As a direct and proximate result of OWW's violation of § 1 of the Sherman Act, Alps has been injured in its business and property.  Alps has had to expend substantial sums in defending the lawsuits brought against it by OWW for infringing the OWW Fraudulently Obtained Patents.  As a consequence of such expenditures, Alps ability to further develop and market its existing products has been impaired, as has its ability to develop and market new products.  In addition, as a result of OWW's enforcement of the OWW Fraudulently Obtained Patents against it, and OWW's assertion in the marketplace that Alps infringes its

patents, customers and potential customers have been reluctant to do business with Alps, and it has lost sales and profits as a result.

      60.    The injuries sustained by Alps as a result of OWW's violation of § 1 of the Sherman Act are antitrust injuries, that is, injury of the type the antitrust laws were intended to prevent and that flow from that which makes OWW's acts unlawful. Alps injuries flow directly from the concerted actions of OWW and Kania to unreasonably restrain trade in the market for fabric-covered polymeric gel liners by initiating and maintaining a series of lawsuits against Alps and other competitors in these markets, seeking to enforce the OWW Fraudulently Obtained Patents for the purpose of excluding these competitors, including Alps, from the market.

      61.    As a result of OWW's violation of § 1 of the Sherman Act, Alps is entitled to recover treble damages and its costs of suit, including reasonable attorney's fees, pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, and it is entitled to injunctive relief, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26.

### OWW Has Violated § 2 Of The Sherman Act

      62.    Alps incorporates the allegations of paragraphs 1-61 of this complaint as if fully rewritten herein.

      63.    OWW has monopolized or is attempting to monopolize the market for fabric-covered polymeric gel liners in violation of § 2 of the Sherman Act. In this market, on information and belief, OWW has a present market share exceeding 50% which has and will continue to increase as a result of OWW's agreements with Otto Bock and Fillauer effectively limiting their sales of fabric-covered polymeric gel liners in the United States. Ossur, which produces a silicone fabric-covered gel liner presently has a market share of approximately 25%

of this market. The fabric-covered gel liner products produced by Ossur are also covered by claims of the OWW Fraudulently Obtained Patents, as construed by OWW.

64.    OWW has willfully engaged in predatory, anti-competitive, and exclusionary conduct with the specific intent of monopolizing the market for fabric-covered polymeric gel liners in aggressively seeking to enforce the OWW Fraudulently Obtained Patents by initiating and maintaining a series of infringement lawsuits against smaller competitors in this market, such as Alps, who have fewer financial resources and who may be less able to defend themselves in such litigation than larger competitors such as Ossur. If OWW has not already obtained monopoly power in this market, there is a dangerous probability that OWW will succeed in obtaining monopoly power in the market for fabric-covered polymeric gel liners in the United States if it is successful in using the OWW Fraudulently Obtained Patents to eliminate Alps and other competitors from this market, which would substantially increase its market power. Also, since it appears that claims of the OWW Fraudulently Obtained Patents (as construed by OWW) also cover products sold by Ossur and other competitors in the market for fabric-covered polymeric gel liners, if OWW is successful in enforcing the OWW Fraudulently Obtained Patents against its smaller competitors like Alps, there is a dangerous probability that OWW will be able to further enhance its monopoly power in the market for fabric-covered polymeric gel liners by using the OWW Fraudulently Obtained Patents to force competitors like Ossur from this market in the United States. This will enable OWW to charge monopoly prices for its fabric-covered polymeric gel liners for the balance of the terms of the patents.

65.    As a direct and proximate result of OWW's violation of § 2 of the Sherman Act, Alps has been injured in its business and property. Alps has had to expend substantial sums in defending the lawsuits brought against it by OWW to enforce the OWW

Fraudulently Obtained Patents.  As a consequence of such expenditures, Alps ability to further develop and market its existing products has been impaired, as has its ability to develop and market new products.  In addition, as a result of OWW's enforcement of the OWW Fraudulently Obtained Patents against it and OWW's assertions in the marketplace that Alps is infringing the OWW Fraudulently Obtained Patents, customers and potential customers have been reluctant to do business with Alps, and it has lost sales and profits as a result.

66.    The injuries sustained by Alps as a result of OWW's violation of § 2 of the Sherman Act are antitrust injuries, that is, injury of the type the antitrust laws were intended to prevent and that flows from that which makes OWW's acts unlawful.  Alps injuries flow directly from OWW's predatory, anti-competitive, and exclusionary conduct in monopolizing or attempting to monopolize the market for fabric-covered polymeric gel liners by initiating and maintaining a series of lawsuits against Alps and other competitors in these markets that seek to enforce the OWW Fraudulently Obtained Patents and to drive these competitors, including Alps, from this market.

67.    As a result of OWW's violation of § 2 of the Sherman Act, Alps is entitled to recover treble damages and its costs of suit, including reasonable attorney's fees, pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15, and it is entitled to injunctive relief, pursuant to § 16 of the Clayton Act, 15 U.S.C. § 26.

## COUNT II

### (LANHAM ACT CLAIM)

68.    Alps incorporates paragraphs 1-67 of this complaint, as if fully rewritten herein.

69.    OWW has violated § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). OWW has used the Internet and other forms of interstate commerce to promote and advertise its fabric-covered polymeric gel liners, by issuing press releases on its website and otherwise and by making statements to trade publications with the expectation that such statements will be published, asserting that Alps is infringing the OWW Fraudulently Obtained Patents. It has done so for the purpose of disseminating these statements into the marketplace throughout the United States and internationally, knowing that its statements regarding Alps' alleged infringement of its patents would be published in trade publications that would be read by customers and potential customers for the fabric-covered polymeric gel liners sold by OWW and Alps.

70.    Because OWW had information from which it knew that the OWW Fraudulently Obtained Patents were invalid and unenforceable at the time it issued the press releases and made such other statements, the assertion that OWW is protecting its intellectual property rights and that Alps is infringing the OWW Fraudulently Obtained Patents misrepresents the nature, characteristics, and qualities of OWW's fabric-covered polymeric gel liners by claiming that such liners are entitled to patent protection, when they are not, as well as misrepresenting the nature, characteristics, qualities of the competing Alps liners, by asserting that these products infringe OWW's patents, when it knows that those patents are invalid and unenforceable. The above statements were made in bad faith and are deceptive and misleading.

71.    The audience for the statements made in the OWW press releases and other statements that it has made to trade publications is customers who purchased products from OWW and Alps, such as distributors and prosthestists. Such customers have been actually deceived or are likely to be deceived by OWW's statements that it is protecting its intellectual property rights in undertaking infringement litigation against Alps and others based on the OWW

Fraudulently Obtained Patents. OWW's deceptive and misleading statements to such customers are material in that they are likely to influence their purchasing decisions, because such customers may be reluctant to purchase fabric-covered polymeric gel liners from Alps and other competitors in that market because of OWW's assertion of infringement of the OWW Fraudulently Obtained Patents, and the possibility that, as purchasers of the alleged infringing products, who will resell such products, they too could be sued by OWW for patent infringement. OWW has caused its deceptive and misleading statements to enter interstate commerce by posting its press releases on its website, which is accessible throughout the United States and by making statements to trade publications that are available throughout the United States.

73.    OWW's deceptive and misleading statements have resulted in injury to Alps and will cause injury in the future, because there are customers who have or will refuse to do business with Alps as a result of the deceptive and misleading assertions by OWW that Alps is infringing the OWW Fraudulently Obtained Patents.

**WHEREFORE**, Alps respectfully requests that the Court:

A.    Grant judgment in favor of Alps and against OWW and Kania, awarding Alps three times its damages and its costs of suit, including reasonable attorneys' fees, for their violation of the antitrust laws, pursuant to § 4 of the Clayton Act, 15 U.S.C. § 15;

B.    Enjoin OWW and Kania from bringing, maintaining or supporting any lawsuit involving the OWW Fraudulently Obtained Patents, pursuant to § 16 of the Clayton Act, 16 U.S.C. § 26;

C.      Grant judgment in favor of Alps and against OWW, awarding it damages for OWW's violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and enjoining OWW from making any such deceptive and misleading statements regarding Alps or its products;

D.      Grant Alps such other and further relief as the Court deems just and proper.

                                                   s/David W. Wicklund
                                                   David W. Wicklund (0012109)
                                                   SHUMAKER, LOOP & KENDRICK, LLP
                                                   1000 Jackson Street
                                                   Toledo, Ohio 43604
                                                   TEL: (419) 241-9000
                                                   FAX: (419) 241-6894
                                                   dwicklund@slk-law.com

OF COUNSEL:                     Ronald A. Christaldi
                                                   J. Todd Timmerman
                                                   Mindi M. Richter
                                                   SHUMAKER, LOOP & KENDRICK, LLP
                                                   101 E. Kennedy Boulevard
                                                   Suite 2800
                                                   Tampa, Florida 33602
                                                   TEL: (813) 229-7600
                                                   FAX: (813) 229-1660
                                                   rchristaldi@slk-law.com
                                                   ttimmerman@slk-law.com
                                                   mrichter@slk-law.com
                                                   Attorneys for Defendant Alps South, LLC

## JURY DEMAND

Plaintiff, Alps South LLC, hereby demands a jury trial on all issues triable of right by a jury.

s/David W. Wicklund
David W. Wicklund (0012109)
SHUMAKER, LOOP & KENDRICK, LLP
1000 Jackson Street
Toledo, Ohio 43604
TEL: (419) 241-9000
FAX: (419) 241-6894
dwicklund@slk-law.com

OF COUNSEL:

Ronald A. Christaldi
J. Todd Timmerman
Mindi M. Richter
SHUMAKER, LOOP & KENDRICK, LLP
101 E. Kennedy Boulevard
Suite 2800
Tampa, Florida 33602
TEL: (813) 229-7600
FAX: (813) 229-1660
rchristaldi@slk-law.com
ttimmerman@slk-law.com
mrichter@slk-law.com